UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ERIN BETHURAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04146-SEB-DML |
| | ) | |
| CATHEDRAL TRUSTEES INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment
[Dkt. 38], filed on October 8, 2020 pursuant to Federal Rule of Civil Procedure 56.
Plaintiff Erin Bethuram ("Ms. Bethuram") has brought this lawsuit against her former
employer, Defendant Cathedral Trustees Inc. ("Cathedral"), alleging that Defendant
violated her Title VII rights under the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*
("Title VII"), by engaging in reverse race discrimination and then retaliating against her
following a complaint she lodged with Defendant's Human Resources Generalist
concerning this alleged discrimination. Defendant denies these allegations, but the
material, underlying facts of Ms. Bethuram's cause of action are not in controversy
between the parties.

For the reasons detailed below, we GRANT Defendant's Motion for Summary
Judgment.

**Factual Background**

**I.       General Background**

1

Defendant Cathedral Trustees Inc. owns and operates Cathedral High School, a non-profit and independent Catholic High School located in Indianapolis, Indiana. Bridges Decl. ¶ 6. Cathedral is accredited by the State of Indiana, the Independent School Association of the Central States ("ISACS"), and the North Central Association of Colleges and Schools. *Id.* ¶ 7. At all times relevant to this litigation, Dr. Robert Bridges was President of Cathedral Trustees, Inc., and David Worland served as Principal of Cathedral High School.[1] *Id.* ¶ 2–3; Worland Decl. ¶ 2. In July 2012, Ms. Bethuram's employment began at Cathedral as an Academic Services Assistant. She remained in this position for approximately four years when she was promoted to Registrar on September 19, 2016, where she remained until May 24, 2019. Bethuram Dep. 30, 163; Worland Dep. 67–68.

As Registrar, Ms. Bethuram worked as a member of the Counseling Department, reporting to the Director of Counseling (most recently Anne Katz) as well as the Academic Vice Principal (Dennis Thomas).[2] Bethuram Dep. 88; Worland Dep. 70–72. The Counseling Department included, in addition to the Registrar, three Guidance Counselors, three College Counselors, and one Mental Health Counselor. Worland Dep. 73–74. During Ms. Bethuram's tenure, all members of the Counseling Department were

---

[1] Mr. Worland voluntarily resigned his position as Principal in January 2020 to accept the position with Cathedral as Senior Vice President for Mission and Advancement, but we refer to Mr. Worland in this Order by the title he held during the time of the events giving rise to this dispute. Worland Decl. ¶ 2.
[2] Dennis Thomas voluntarily left Cathedral in December 2019 to become Principal of Shortridge High School, but we refer to Mr. Thomas by the title he held at Cathedral during the relevant time. Thomas Decl. ¶ 2.

white/Caucasian. *Id.* at 74. Ms. Bethuram was responsible, *inter alia*, for maintaining all permanent records of students enrolled at Cathedral, directing all reports of grades, inputting academic data for incoming students, posting honor rolls, updating student GPAs, maintaining confidentiality of student records and files, fulfilling transcript requests, and providing data reports to the Indiana Department of Education. Bethuram Dep. 76–83. During the 2018-2019 school year, Ms. Bethuram also took on the additional duties and title of Testing Coordinator, overseeing the standardized testing procedures for Cathedral students. *Id.* at 86.

## II.    Restructuring Cathedral's Counseling Department

During the 2016-2017 school year, Cathedral suffered the tragic loss of two students due to suicide, which, among other reactions, prompted Cathedral's Parent Resource Group to conduct a survey in February 2017 of Cathedral parents, students, and faculty/staff concerning student wellbeing. Bridges Decl. ¶ 9. The survey revealed a need for increased interaction among the counselors, students, and parents, and culminated in a recommendation that the Cathedral counseling resources be structured and deployed more effectively. *Id.* The survey also disclosed that the heavy caseloads assigned to and managed by Cathedral counselors left them feeling overwhelmed. *Id.* In response to these findings and recommendations, Vice Principal Thomas discussed with Principal Worland what had become a pressing need to restructure Cathedral's Counseling Department in an effort to prevent future shortcomings and failures. Despite the apparent urgency attached to such changes, no specific plan was immediately adopted. Thomas Decl. ¶ 17.

Cathedral's Parent Resource Group conducted a second survey in January 2018 to explore more deeply the findings of the February 2017 survey. Again, the need for more counselor interaction with students and parents was documented in response to which a Task Force was created to formulate ideas and proposals for improvement of the Counseling Department. Bridges Decl. ¶ 11. Anne Katz, then-Director of Counseling, along with Mr. Thomas spearheaded this effort to restructure the Counseling Department, which process commenced with informal discussions of how best to proceed. Thomas Decl. ¶ 18. The Task Force deliberations eventually revealed that the primary concerns centered on the students' need for more individualized attention because students' needs were not being met and counselors' caseloads were too high. *Id.* at ¶¶ 19–21.

During the Fall 2018 semester, a review of the Counseling Department by Cathedral's accreditation organization, ISACS, identified issues similar to those uncovered in the two school-conducted surveys during the two prior years. ISACS specifically recommended that Cathedral: (1) find ways for more face-to-face interactions between the counselors and faculty/staff/administration to discuss student wellness issues; (2) evaluate ways to reduce the caseloads of counselors to levels more in line with best practices in independent schools; and (3) develop a rotating office coverage schedule that would allow counselors some "refresh" time during the school day. Bridges Decl. ¶ 13. After analyzing ISACS's recommendations, Ms. Katz and Mr. Thomas determined that, with only six counselors staffing the Counseling Department for the 2018-2019 school year, their counselor-to-student ratio would not qualify Cathedral for accreditation by the Recognized American School Counselor Association Model Program ("RAMP");

to qualify, Cathedral would have to lower its counselor-to-student ratio to two hundred fifty students to one counselor. Both Mr. Thomas and Ms. Katz viewed RAMP's accreditation as very important to their school's performance and reputation. Thomas Decl. ¶ 21.

This finding and the ISACS's report along with the Parent Resource Group surveys motivated Ms. Katz and Mr. Thomas to confer with Principal Worland to advocate for the formulation of a plan to restructure the Counseling Department by hiring a fourth counselor. Principal Worland, duly advised, agreed with the need to restructure but noted that any new hiring would have to conform with Cathedral's current budget limitations. Thomas Decl. ¶ 24; Worland Dep. 112–13. Principal Worland stressed that Cathedral could not afford to hire a new counselor unless Ms. Katz and Mr. Thomas could figure out "another way of cost savings of some sort." Worland Dep. 113.

After further discussions and reflection, Mr. Thomas and Ms. Katz determined that the best way to add a new counselor position to the Department was to eliminate the Registrar position then filled by Ms. Bethuram. Under their plan, Ms. Bethuram's duties would be distributed among other departments (such as the Technology Department) and allocated to other administrators as well as to the counselors staffing the Counseling Department. Thomas Decl. ¶ 25. By January 2019, Principal Worland had given his preliminary approval to begin the hiring process to engage a fourth school counselor with the understanding that, in order to acquire a new person in that role, Ms. Bethuram's position as Registrar would be eliminated. *Id.* at ¶ 26. Coincidentally, one of the current school counselors, Greg Bamrick, had decided and made known in the Fall of 2018 that

he would be moving into the Transportation Director position for the 2019-2020 school year, thus necessitating an expanded search/hiring process for the ensuing academic year to bring on two school counselors—one to replace Mr. Bamrick and the second to fill the preliminarily approved additional fourth counselor position. *Id.* at ¶ 28; Bridges Decl. ¶ 14; Denny Decl. ¶ 7.

Brittany Denny, a Cathedral alumna and African American woman, became the front-runner candidate to replace Mr. Bamrick. She had previously reached out to Cathedral President Robert Bridges during the Fall of 2018 to express an interest in returning to Cathedral to serve as a school counselor. Thomas Decl. at ¶ 29. Ms. Denny was interviewed by Mr. Bridges in October 2018, and he informed her that there would be an opening in the Counseling Department for the 2019-2020 school year caused by Mr. Bamrick's move to the Transportation Director position. Denny Decl. ¶ 7. Ms. Denny applied for the Counselor position on January 9, 2019 and was interviewed on February 7, 2019 and again on March 26, 2019. Denny Decl. ¶ 7. The decision was made in late March 2019 to offer Ms. Denny the school counselor position vacated by Mr. Bamrick when he moved to the Transportation Director position and she was formally offered the position on April 3, 2019. Thomas Decl. ¶ 29; Worland Decl. ¶ 12–13. In early March 2019, Cathedral accepted applications to fill the newly created fourth counselor position that was to be created by the elimination of the Registrar position, and following several rounds of interviews, Andrew Smeathers, a Caucasian male, was selected and offered the job on April 12, 2019, which he accepted on April 22, 2019. Worland Decl. ¶ 15; Worland Dep. 157, 168–69.

### III.    Ms. Bethuram's 2018-2019 School Year

### A.  Ms. Bethuram's Job Performance

Both parties acknowledge that concerns had arisen regarding the quality of Ms.

Bethuram's job performance during the 2018 spring semester which concerns continued

on into 2019. Though Ms. Bethuram correctly notes that she was never put on any

official performance improvement plan under Cathedral's progressive discipline policy,[3]

she concedes that she was counseled on two separate occasions regarding her practice of

"gossiping" and her need to improve the quality of her interactions with students. Dkt. 41

at 5; Bethuram Dep. 94–95, 101.[4]

Defendant's evidence provides a more expansive view of the underlying problems

giving rise to these counseling sessions with Ms. Bethuram. The first occasion referenced

by Ms. Bethuram occurred during the Spring of 2018, when Mr. Thomas, who was Ms.

Bethuram's supervisor, counseled her concerning complaints he had received regarding

her job performance, including: (1) reports of unprofessional interactions with students

and instances of unkindness and being unwelcoming toward students and parents who

visited the Counseling Department; (2) reports that she used her work computer for

online shopping and other personal matters; (3) reports over her lack of professionalism

in the form of frequently engaging in gossip,  listening to private voicemails on

---

[3] Cathedral has a progressive discipline policy consisting of four steps: "verbal warning, written warning, suspension with or without pay, or termination of employment." Worland Dep. 89; Worland Dep., Ex. 1 at 14.

[4] Ms. Bethuram disagrees that her interactions with students were unkind or unwelcoming and, while she admits that she did engage in gossip, she believes the gossip to have been nothing more than "regular work gossip that you find anywhere." Bethuram Dep. 98.

speakerphone, and being unfriendly towards students; and (4) reports of instances of passive aggressive behavior towards the counselors and times when she displayed an unprofessional attitude in interacting with the counselors. Thomas Decl. ¶ 11.

Cathedral asserts that during the Fall of 2018 and into January 2019, the quality of Ms. Bethuram's job performance continued to decline. *Id.* at ¶ 13; Worland Decl. ¶ 9. On January 25, 2019, Ms. Katz met with Ms. Bethuram for a "[d]iscussion of past semester and recent detail oriented mistakes." Bethuram Dep. 109–111, 220. The referenced mistakes included Ms. Bethuram's having sent out ISTEP letters with parent claim codes connected to other students, causing parents to receive ISTEP information for students other than their own; recording incorrect transcript information, necessitating that some transcripts be resent; recording a Spanish class as a two credit class instead of a one credit class, resulting in two students having been removed from the honor roll after grades had been finalized by the time the error was discovered; switching students' last names in the process of organizing the PSAT testing procedures, resulting in an incorrect accommodation qualification and delayed score results; and committing multiple errors while managing the scheduling process for class registration. *See, e.g.*, *id.* at 102–07, 110–11; Thomas Decl. ¶ 13. Principal Worland viewed this meeting between Ms. Katz and Ms. Bethuram as tantamount to a "verbal warning" under Cathedral's progressive discipline policy but confirmed that this was the only instance or form of discipline that Ms. Bethuram ever received pursuant to that policy. Worland Dep. 90–91.

Although Ms. Bethuram contends that following her meeting with Ms. Katz she took immediate steps to prevent future mistakes [Dkt. 41 at 6], her improvement efforts

fell short of that goal. Cathedral presented evidence of additional detail-oriented mistakes made by Ms. Bethuram that occurred through February 2019. Dkt. 39 at 8.[5] While not specifically denying that she had made such errors or mistakes, Ms. Bethuram did testify that she did not recall being counseled about these missteps between January 25, 2019, and April 1, 2019. Bethuram Dep. 120–26.

### B.  April 2, 2019 Meeting Between Principal Worland and Ms. Bethuram

On April 2, 2019, at Principal Worland's request, a meeting was held with Ms. Bethuram to allow Principal Worland to discuss her documented job errors and performance issues and inform her that the school's search to find a replacement for Mr. Bamrick had been successful. No one else attended this meeting. Principal Worland also informed Ms. Bethuram that the Counseling Department was likely to be restructured to create a new, fourth counselor position. *Id.* at 126–28; Worland Dep. 99, 104, 106–07. Principal Worland testified that, in discussing the restructuring plan, he told Ms. Bethuram that, in view of the overriding need to hire an additional school counselor, "her position was probably going to be eliminated" to free up funds for the new counselor position. *Id.* at 106.

---

[5] On January 30, 2019, Ms. Bethuram incorrectly announced to more than ten students that Cathedral would be conducting an e-learning day the next day. Thomas Decl. ¶ 16. On February 13, 2019, Ms. Bethuram sent incorrect information to Cathedral parents utilizing the wrong email return address, namely, Principal Worland's email address, instead of her own. *Id.*; Worland Dep. 84. On or about February 25, 2019, Ms. Bethuram made errors in creating the ISTEP schedule by failing to include time for reading the instructions or a buffer time between each test, resulting in an inaccurate schedule overall. Thomas Decl. ¶ 16.

Ms. Bethuram does not dispute that Principal Worland informed her that she might possibly lose her position as Registrar due to Cathedral's plan to restructure the Counseling Department, but she maintains that Principal Worland, in explaining the reason for this restructuring, said it was going to occur "so he could bring in a person of color in the counseling department." Bethuram Dep. 128. Principal Worland denies ever having made this statement or even holding this view. In any event, by the time of this meeting, Ms. Denny had been hired as a counselor. He testified that he recalled telling Ms. Bethuram that he was looking for a person who would be a "good fit," explaining that he "would have used the word . . . diversity, meaning diversity . . . of gender, of socioeconomic, of experience, of geography" but he did not and would not have used the term "people of color." Worland Dep. 108–09. Ms. Bethuram also testified that Principal Worland told her that the "person of color" to be brought in as the new counselor would likely serve as part-time registrar and part-time counselor. Bethuram Dep. 132.[6]

Principal Worland inquired of Ms. Bethuram whether, since she was not qualified for the counselor role and the Registrar position was potentially being abolished, there was any other job she was interested in performing at Cathedral, mentioning perhaps an English-teaching position.[7] Worland Dep. 107–10. Ms. Bethuram replied suggesting that

---

[6] Cathedral's evidence reveals that, following the elimination of the Registrar position, Ms. Bethuram's former duties were distributed among fifteen Cathedral employees. Dkt. 39 at 26; Thomas Supp. Decl. ¶¶ 13–14. Because many of the Registrar duties involved data collection and dissemination, Jim Wilkinson, Cathedral's Apple and Data Specialist and a Caucasian male, was assigned the majority of the Registrar's former duties. Thomas Supp. Decl. ¶ 15.

[7] Principal Worland testified that he knew Ms. Bethuram was working on completing her bachelor's degree in English and thought that she might be interested in applying for an English-teaching position, if one were to become available in the 2019-2020 school year. Worland Dep. 107.

perhaps she could continue doing something with testing coordination, a responsibility she performed as part of her duties as Registrar; beyond this, she did not identify anything else. *Id.* at 107–11; Bethuram Dep. 130. Ms. Bethuram admits that she knew she was not qualified for a counselor position. Bethuram Dep. 132, 178. Principal Worland also discussed during the meeting Ms. Bethuram's job performance issues, but he assured her that the decision relating to the possible elimination of the Registrar position was in no way performance-based. Worland Dep. 115–17.

### C.  April 3, 2019 and April 8, 2019 Budgetary Meetings

On April 3, 2019 and April 8, 2019, Cathedral Chief Financial Officer Ms. O'Brien-Teasley, Cathedral President Mr. Bridges, Principal Worland, and Vice-Principal Thomas conducted budget meetings to discuss faculty/staff reductions. Thomas Decl. ¶ 30–35. Based on Cathedral's projected budget for the 2020 fiscal year, all four officials ultimately concurred in the plan to eliminate the Registrar position in order to add a fourth school counselor position, and to proceed with the non-renewal of Ms. Bethuram's employment agreement. *See, e.g., id.*[8]

---

[8] Ms. Bethuram argues that the declarations submitted by Mr. Bridges, Mr. Thomas, and Ms. O'Brien Teasley [Dkt. 40-1; Dkt. 40-5; Dkt. 40-7] claiming that the decision to eliminate the Registrar position was finalized between April 3, 2019 and April 9, 2019 should be disregarded as "sham affidavits" because they conflict with Principal Worland's testimony that he was still considering retaining Ms. Bethuram in another position at Cathedral. Dkt. 41 at 20–21. Cathedral asserts that the referenced individuals cannot be accused of having changed or contradicted their "prior testimony" because they were never deposed by Plaintiff. Thus, their declarations cannot be construed as sham affidavits. Dkt. 47 at 16. The only witnesses deposed in this litigation were Ms. Bethuram and Principal Worland. *Id.* We hold that the submitted declarations are not "sham affidavits" for the same reasons put forth by Cathedral, which we adopt; accordingly, the declarations have been considered in our review of this motion. *See Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015) ("A 'sham affidavit' is an affidavit that is inadmissible because it

### D.  April 15, 2019 Meetings Between Ms. Bethuram, Ms. Ernst, and Principal Worland

On April 15, 2019, a week following the date on which the final decision was made by the four officials to restructure the Counseling Department, Ms. Bethuram emailed Cathedral's Human Resources Generalist Beth Ernst to request a meeting with her to report a complaint of discrimination. Bethuram Dep. 142–43; Ernst Decl. ¶ 21. Ms. Bethuram met with Ms. Ernst that same day to report that Principal Worland had told her during their April 2nd meeting that she "may possibly lose [her] position so he could bring in a person of color in the counseling department." Ernst Decl. ¶ 21. Ms. Bethuram cites this statement by Principal Worland as the basis of her reverse race discrimination claim against Defendant. *Id.* Ms. Ernst informed Ms. Bethuram that she would promptly investigate her complaint and, in addition, recommended that Ms. Bethuram and Mr. Worland schedule a follow-up meeting regarding the status of any changes to the structure of the Counseling Department. *Id.*

Ms. Ernst promptly contacted Principal Worland to request a meeting with him, which conference occurred either on April 15, 2019 or April 16, 2019 and involved Ms. Ernst's report of Ms. Bethuram's allegation of reverse race discrimination, which attributed statement Principal Worland denied. *Id.* at ¶ 23; *see also* Worland Dep. 129, 133–35. Ms. Ernst recommended that Principal Worland schedule a follow-up meeting with Ms. Bethuram to discuss: (1) the investigation into Ms. Bethuram's complaint of

---

contradicts the *affiant's* previous testimony . . . unless the earlier testimony was ambiguous, confusing, or the result of a memory loss." (citations omitted) (emphasis added)).

reverse race discrimination and (2) the final decision to eliminate the Registrar position in order to permit the hiring of a fourth School Counselor. Ernst Decl. ¶ 23.

### E.  April 17, 2019 Termination Meeting

Two days thereafter, on April 17, 2019, a meeting was convened attended by Ms. Ernst, Principal Worland, Ms. Bethuram, and Lisa Ford (a Cathedral teacher who attended the meeting at Ms. Bethuram's request) during which Principal Worland and Ms. Ernst informed Ms. Bethuram that her position was, as previously predicted, being eliminated due to the restructuring of the Counseling Department and that her employment would therefore end effective May 24, 2019. Bethuram Dep. 146–47; Worland Dep. 135, 137–38. Upon learning of her impending termination, Ms. Bethuram became angry and distressed and departed the gathering before it had officially concluded. Worland Dep. 138.

The parties dispute the precise timing of Principal Worland's decision to terminate Ms. Bethuram's employment, rather than to find a way to retain her as a Cathedral employee in a position other than Registrar. Ms. Bethuram contends that Principal Worland decided to terminate her employment only after he learned that she had reported to Ms. Ernst her claim of reverse race discrimination. Dkt. 41 at 22–23. Principal Worland concedes that before learning of Ms. Bethuram's reverse discrimination complaint there remained a possibility that Ms. Bethuram could be reassigned to another position, but only if a spot could be identified that would be "a good fit" for her and for

Cathedral.[9] Worland Dep. 129. The English teacher position, first mentioned in the April 2, 2019 meeting between Ms. Bethuram and Principal Worland, was neither specifically brought up again by Ms. Bethuram nor discussed during the April 17, 2019 meeting. *Id.* at 138.

Principal Worland testified that, as of April 14, 2019, which was the day before Ms. Bethuram complained to Human Resources, he knew that the Registrar position was going to be eliminated and that Cathedral was going to hire a fourth counselor, the budgetary support for which would come from the discontinued registrar position. *Id.* at 129. Principal Worland stated that, by "the 14th or 15th, [he] would have decided that there's no other positions available that [Ms. Bethuram] would probably be qualified for." *Id.* at 139–40. This disagreement as to the timing of the decision to terminate rather than to reassign Ms. Bethuram to another position is ultimately immaterial to a resolution of the issues before us, however, because the final decision to eliminate the Registrar position had already been made by Cathedral's upper level administrators prior to Ms. Bethuram's complaint to Human Resources and, in addition, because Ms. Bethuram neither applied for nor was qualified for any open position(s) within Cathedral for the 2019-2020 school year. Bethuram Dep. 178–80.

---

[9] Principal Worland testified that "[i]f [Ms. Bethuram] came to me and said, hey, you know I've been thinking about that teacher position, I'd like to apply for an English position . . . I probably would have given her consideration, but not a final approval. So at this time I think there was still a possibility that [Ms. Bethuram] could have been a part of our faculty or staff, but not as registrar." Worland Dep. 129.

On May 14, 2019, Cathedral confirmed in writing Ms. Bethuram's involuntary separation, stating that the reason for separation was "a reorganization of the Counseling Department," and that Cathedral was "eliminating the position of Registrar." Dkt. 42-3.

## IV.    The Instant Lawsuit

Ms. Bethuram filed this lawsuit on October 8, 2019 after receiving the notice of her right to sue from the Equal Employment Opportunity Commission ("EEOC") on September 30, 2019. She alleges that Cathedral intentionally terminated her as a white woman to replace her with a person of color and also retaliated against her for engaging in statutorily protected activity, all in violation of Title VII. Cathedral has moved for summary judgment on Ms. Bethuram's claims and that motion has been fully briefed by the parties making it now ripe for decision.

## Legal Analysis

## I.    Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

15

In employment discrimination cases, the summary judgment standard is applied rigorously "because intent and credibility are such critical issues and direct evidence is rarely available." *Howard v. Indianapolis Pub. Sch.*, No. 1:13-cv-02039-SEB-TAB, 2017 WL 1165497, at *7 (S.D. Ind. Mar. 29, 2017), *aff'd*, 727 F. App'x 198 (7th Cir. 2018) (citations omitted). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997). We find no genuine disputes as to any material facts in the matter now before the Court that would prevent a summary ruling.

## II.   Discussion

### A.  Title VII Claims

Ms. Bethuram claims that she was terminated because of her Caucasian race in order to allow for the hiring of a person of color and retaliated against for complaining of this reverse discrimination against her to Defendant's Human Resources Generalist, all in violation of Title VII (42 U.S.C. § 2000e-2(a)(1)).  In analyzing these claims, we apply the guidance handed down by the Seventh Circuit in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination and retaliation

16

claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765). Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.

Here, Ms. Bethuram has elected to proceed under *Ortiz* rather than according to the *McDonnell Douglas* framework, arguing that, based on the totality of the evidence, a jury could readily conclude that Defendant unlawfully discriminated against her on the basis of race (Caucasian) and retaliated against her, in violation of Title VII, when it terminated her employment. We follow her lead here by analyzing her claims in that fashion, mindful that "(u)nder either method, a plaintiff must produce sufficient evidence to allow a jury to infer that race was a motivating factor in the Defendant's decision" to terminate her employment. *Bibbs v. Bd of Trustees for Univ. of Illinois*, 9 F. Supp.2d 964, 969 (1998); *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1350 (7th Cir.1995). *See Purtue v. Wisconsin Department of Corrections*, 963 F.3d 598, 601–02 (7th Cir. 2020) (stating that "plaintiff need not rely on the *McDonnell Douglas* method to carry [her burden at summary judgment]; she may well have other 'direct or circumstantial evidence that supports an inference of intentional discrimination.'" (quoting *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020

### 1.    Reverse Discrimination Claim

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The protections offered under Title VII are not limited to members of historically discriminated-against groups. *Mills v. Health Care Service Corp.*, 171 F.3d 450, 454 (7th Cir. 1999) (citations omitted). Ms. Bethuram brings her lawsuit as a Caucasian employee. Where, as here, the plaintiff is in a majority group, in assessing whether the evidence as a whole supports an inference of discrimination, courts will consider "background circumstances [that show] the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand." *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (quoting *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005)).

Courts have found evidence that members of one race were fired and replaced by members of another race, *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 822 (7th Cir. 2006), or evidence that employers "are under pressure from affirmative action plans, customers, public opinion, the EEOC, a judicial decree, or corporate superiors imbued with belief in 'diversity'" sufficient to establish the requisite background circumstances. *Preston v. Wis. Health Fund*, 397 F.3d 539, 542 (7th Cir. 2005) (citing *Hill v. Ross*, 183 F.3d 586 (7th Cir. 1999)). "In the end, these background circumstances must 'support an inference that the defendant is one of those unusual employers who discriminates against

the majority.'" *Dorson v. Z2 Systems, Inc.*, No. 19-cv-01650, 2019 WL 4824225, at *2 (N.D. Ill. Oct. 1, 2019 (quoting *Mills*, 171 F.3d at 455).

Ms. Bethuram contends here that Cathedral's decision to fund the new counselor position with money previously allocated for the Registrar position and thereby abolish that post violated her Title VII rights because that restructuring was undertaken, as Principal Worland indicated was his purpose, in order to give the job to a non-white employee. Upon careful review we find, however, that the background circumstances and chronology of events before us, when viewed as a whole, fall well short of demonstrating that Cathedral had a reason or inclination to discriminate against people of Ms. Bethuram's race (Caucasian) nor does this evidence reveal that something "fishy" was at hand when Cathedral eliminated Ms. Bethuram's position. Accordingly, Ms. Bethuram's reverse discrimination claim cannot survive summary judgment.

We accept as true, as we are required to do at the summary judgment stage, that, on April 2, 2019, Principal Worland expressed to Ms. Bethuram that her position might be eliminated to enable him to hire a person of color into the Counseling Department. This statement, at most, raises the inference that Principal Worland personally had a desire to restructure the Counseling Department in order to increase racial diversity. Other than this single remark, however, there is no evidence indicating that any of the several other decisionmakers involved in the adoption of this reorganization plan harbored any race-based animus or, specifically, any intent to discriminate against Caucasians. Nor does Ms. Bethuram explicitly argue, much less prove, that any of these decisionmakers were somehow improperly influenced in their decision to approve the

19

creation of the fourth counselor position and the abolition of the Registrar's role by Principal Worland's allegedly discriminatory motive. Ms. Bethuram's theory of reverse discrimination thus hangs on a very thin evidentiary reed.

Viewing the evidence as a whole, it is wholly insufficient to raise the inference that the decision to abolish the Registrar position was borne from any pressure or other desire to racially diversify the Counseling Department. Rather, the seeds of the decision to abolish the Registrar position were planted during the academic year 2016–2017 following the tragic suicides of two students, when Cathedral parents met to discuss what actions to take, eventually proposing that a survey be conducted to determine where the source of the problems lay. From those discussions it was Vice Principal Thomas, not Principal Worland, who first brought up the need to restructure the Counseling Department to enable Cathedral to hire an additional counselor to reduce the workload and allow more individualized attention for the students. These deliberations continued into the next academic year (2017–2018), when a second survey was conducted, and a Task Force headed by Director of Counseling Katz and Vice Principal Thomas began to prepare a plan forward and to strategize. In the Fall of 2018, after ISACS, the accrediting authority, recommended additional counselors, Ms. Katz and Mr. Thomas proposed the hiring of an additional counselor to Principal Worland who authorized them to come up with a plan that could be implemented with no new budgetary support being required. Eventually, Ms. Katz and Mr. Thomas proposed to Principal Worland that the Registrar position be abolished, and those duties redistributed to other employees, which plan Principal Worland preliminarily approved in early 2019. The restructuring of the

Counseling Department and the elimination of Ms. Bethuram's position was then finally approved during budget meetings conducted April 3–8, 2019, which involved the Cathedral CFO and President of the Board as well as Principal Worland and Vice Principal Thomas. All four agreed during those sessions on the restructuring plan for the Counseling Department.

As these facts illustrate, the process of decision-making that resulted in the elimination of Ms. Bethuram's position thus occurred over two years' time, involved many participants and decisionmakers, and was driven by important administrative concerns that were unrelated to race or any broader diversity initiative. This detailed, multi-layered, time-consuming, well considered plan to redistribute the Registrar's duties in order to hire a much-needed additional counselor was deliberate and transparent, which is to say, not "fishy" in any sense. When viewed against this backdrop, Principal Worland's single, isolated statement, which, according to Ms. Bethuram revealed his discriminatory plan to abolish the Registrar's position resulting in the termination of Ms. Bethuram's employment in order to bring on a person of color into the Counseling Department simply cannot be linked to her termination in such a way that would permit a jury to conclude that his statement or intention was a motivating factor behind Cathedral's actions in abolishing the Registrar's position and letting her go.

Ms. Bethuram's rejoinder relies heavily upon the fact that Cathedral hired Ms. Denny, an African-American woman, in close succession to Principal Worland's comment regarding his desire to hire a person of color into the Counseling Department. Ms. Bethuram claims this fact proves that her position was eliminated so that she could

be "replaced" by a non-white employee, in violation of Title VII. Although suspicious timing can, at least when considered in conjunction with other "corroborating" evidence, raise an inference of discrimination, *Skylarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015), this argument is a nonstarter here as it was Mr. Smeathers, a Caucasian male, *not* Ms. Denny, who was hired to assume the new Counselor position created after the Registrar position was abolished.

Ms. Bethuram's attempt to conflate these two hirings to support her discrimination claim is unavailing. The undisputed evidence establishes that, although Ms. Denny was not officially hired until April 3, 2019, Cathedral first began considering her for a Counselor position in the fall of 2018—months before the restructuring plan was even preliminarily approved—after it learned that one of its existing counselors, Mr. Bamrick, would be leaving his position at the end of the 2018–2019 academic year and Ms. Denny expressed interest in the vacancy. Ms. Denny applied in January 2019 and was first interviewed for that position in February 2019, more than a month before any interviews were conducted in connection with the restructuring of the Counseling Department, and she was never interviewed or otherwise considered for the newly created position. Thus, viewing the evidence holistically, it is clear that Ms. Denny's hiring proceeded on a track parallel but unrelated to the decisionmaking process that ultimately resulted in the creation of the new counselor position and the abolition of the Registrar position. Under these circumstances, there is nothing suspicious about the timing of Ms. Denny's hiring or the fact that it happened to coincide with the culmination of Cathedral's decision to

eliminate the Registrar position that would support the inference that Ms. Bethuram was "replaced" by a person of color.

Instead, the undisputed evidence establishes that Plaintiff was terminated as part of the nondiscriminatory reorganization of the Counseling Department and the removal of the Registrar position to address Cathedral's documented need for an additional counselor. Plaintiff concedes that she was not a licensed counselor and thus not qualified for the newly created position resulting from the elimination of her Registrar position. *See Gore v. Indiana Univ.*, 416 F.3d 590, 593 (7th Cir. 2005) (approving defendant's decision not to hire a plaintiff who had no basis to claim that he was more qualified than the candidates that were hired by defendant). As detailed above, she has failed to establish "background circumstances" that would demonstrate that Cathedral had a "reason or inclination to discriminate" against her because of her Caucasian race or any other evidence that would support a jury's finding that Ms. Berthuram's race was a motivating factor in Cathedral's reorganization plan and her ultimate loss of employment. Her reverse race discrimination is therefore unavailing, and Cathedral is entitled to summary judgment on this claim.

### 2.    Retaliation Claim

Ms. Bethuram asserts as a second claim that Principal Worland's decision not to reassign, transfer, or rehire her for a different position at Cathedral, or offer her any alternative positions at Cathedral was because she had interposed a complaint to Ms. Ernst of reverse race discrimination against her. Ms. Bethuram contends that even after the decision had been made to eliminate the Registrar position, Principal Worland was

still considering whether to transfer her to another position within the Cathedral staff or faculty and decided not to offer her an alternative position only after he learned of her discrimination complaint. This, she asserts, was a retaliatory decision made in violation of Title VII.

An employer may not discriminate "against an employee who has 'opposed any practice' made unlawful by Title VII or who 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) (quoting 42 U.S.C. § 2000e–3(a)). To survive summary judgment on a Title VII retaliation claim, a plaintiff must show that she (1) engaged in a statutorily protected activity; (2) suffered an adverse action; and (3) that a causal connection between the two existed. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). "As the Seventh Circuit has held, the primary question for a retaliation claim should always be, '[d]oes the record contain sufficient evidence to permit a reasonable factfinder to conclude that retaliatory motive caused the discharge?'" *Durham v. FreshRealm, LLC*, No. 1:19-cv-04902-TWP-TAB, 2021WL 3089128, at *12 (S.D. Ind. July 22, 2021) (quoting *Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021)).

Cathedral limits its summary judgment argument to the element of causation, opting not to dispute that Ms. Bethuram had engaged in a statutorily protected activity or that she suffered an adverse employment action, to wit, her termination of employment. In support of her retaliation claim, Ms. Bethuram has relied solely on the alleged

temporal proximity of her termination on April 17, 2019 to her statutorily protected

meeting two days prior with Ms. Ernst when she filed a complaint of discrimination.

But temporal proximity alone does not create a triable issue on causation. *Id.*

(citing *Milligan v. Bd. of Trs. of So. Ill. Univ.*, 686 F.3d 378, 389–90 (7th Cir. 2012)).

"[R]etaliation claims under Title VII require traditional but-for causation, not a lesser

'motivating factor' standard of causation." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499,

508 (7th Cir. 2014) (quoting *Reynolds v. Tangherlini*, 737 F.3d 1093, 1104 (7th Cir.

2013) (internal quotations omitted)). "[T]he ultimate question is not whether the timing is

close, but whether the timing is suspicious, that is, whether it 'contributes to an inference

of causation.'" *Al aka-Muhammad v. Marion Cty. Juvenile Detention Ctr.*, No. 1:15-cv-

01495-SEB-MPB, 2017 WL 6055508, at * 7 (S.D. Ind. Dec. 7, 2017).

The timing of Ms. Bethuram's meeting with Ms. Ernst and her subsequent

termination is neither suspicious nor sufficient to show "but-for" causation. The decision

to restructure the Counseling Department and eliminate the Registrar position was made

before Ms. Bethuram met with Ms. Ernst. Ms. Bethuram's assertion that Principal

Worland's decision not to reassign, transfer, or rehire her for a different position at

Cathedral was retaliatory is without merit because she did not apply for or express

interest in an alternative open position and admitted in her deposition testimony that she

was not qualified for any open positions at Cathedral. The evidence, again, when

considered as a whole, provides no basis to conclude that "but-for" her report to Ms.

Ernst, Ms. Bethuram would still be employed with Cathedral. Thus, Ms. Bethuram is

unable to establish the requisite causal connection between her meeting with Ms. Ernst

and her subsequent termination necessary to bring a successful Title VII retaliation claim.

Summary judgment is required on Plaintiff's retaliation claim as well.

### III.    Conclusion

For the reasons detailed above, Defendant Cathedral's Motion for Summary

Judgment [Dkt. 38] is <u>GRANTED</u>. Final judgment shall be entered accordingly.

IT IS SO ORDERED.

Date:    11/5/2021

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Stephanie V. McGowan
FROST BROWN TODD LLC (Indianapolis)
smcgowan@fbtlaw.com

Christopher S. Stake
DELANEY & DELANEY LLC
cstake@delaneylaw.net

Robert B. Thornburg
FROST BROWN TODD LLC (Indianapolis)
rthornburg@fbtlaw.com

Thomas E. Wheeler, II
FROST BROWN TODD LLC (Indianapolis)
twheeler@fbtlaw.com